**RAYCHEM CORPORATION, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, Defendant.**

**No. C–91–20850–RMW.**

United States District Court, N.D. California.

May 4, 1994.

Peter A. Wald, Heller Ehrman White & McAuliffe, San Francisco, CA, for plaintiff.

Ronald E. Mallen, Irene K. Greenberg, Long & Levit, San Francisco, CA, for defendant.

ORDER GRANTING SUMMARY ADJUDI-CATION ON CERTAIN ISSUES AND CONTINUING MOTION AS TO OTH-ER ISSUES

WHYTE, District Judge.

### INTRODUCTION

Plaintiff Raychem Corporation ("Raychem") moves for summary judgment on the breach of contract claim, the first claim for relief in its complaint against Federal Insurance Company ("Federal"). Raychem requests that this court order Federal, pursuant to the terms of the Executive Liability and Defense Coverage insurance policy it sold to Raychem, to pay the full settlement amount and defense costs, less deductible, incurred in *Cytryn et al. v. Cook, et al.* ($8,896,887) plus prejudgment interest.

### BACKGROUND

Raychem purchased an Executive Liability and Defense Coverage insurance policy (the "Policy"), popularly known as directors' and officers' liability insurance, from Federal In-

surance Company on October 8, 1986. The policy's liability limit for the policy year October 8, 1988 to October 8, 1989 was $25 million, with a $1 million deductible under "Insuring Clause 2" of the policy. Clause 2 obligates Federal to reimburse Raychem for certain losses for which Raychem has indemnified its officers, directors and certain other insured executives.[1] Clause 2 provides:

> [Federal] shall pay on behalf of [Raychem] all *loss* for which [Raychem] grants indemnification to each insured person *as permitted or required by law, which the insured person has become legally obligated to pay* on account of any claim first made against him ..., during the policy period ... for a *wrongful act* committed, attempted or allegedly committed or attempted, by such insured person(s) before or during the policy period.

(Langlois Decl., Ex. 1 at § 2.2 (emphasis added).)

The Policy defines "loss" as:

> the total amount which any Insured Person(s) becomes legally obligated to pay on account of each claim ... made against them for wrongful acts for which coverage applies *including ... settlements, costs and defense costs.* Loss does not include fines or penalties imposed by law or *matters uninsurable under the law* pursuant to which this policy is construed.

(Langlois Decl., Ex. 1 at § 2.31 (emphasis added).) "Defense costs" means those losses "consisting of costs, charges and expenses incurred in defending, investigating or monitoring legal actions...." Only "wrongful acts" are insured under Clause 2. "Wrongful act" is defined as:

> any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by any insured person, ... *in his insured capacity,* or any

matter claimed against him solely by reason of his serving in such insured capacity. (Langlois Decl., Ex. 1 at § 2.31 (emphasis added).)

In December 1989, shareholders of Raychem filed a class action lawsuit in federal court ("the *Cytryn* action") against Raychem and twelve of its present or former directors and officers, each of whom were insured persons under the policy during the class period. The suit alleged causes of action for common law fraud, negligent misrepresentation and violations of state statutes, along with a Section 10(b) claim,[2] on behalf of a class of investors who bought Raychem stock or call options between January 27, 1988 and January 11, 1989 ("the class period"). This court dismissed the state law claims in the *Cytryn* action on July 2, 1990, 1990 WL 128233. Although the *Cytryn* defendants sought to dismiss the Section 10(b) claim as well, the court found the allegations to be legally sufficient to state a claim under Section 10(b). Thus, when the lawsuit settled in December 1991, only the Section 10(b) claim was pending.

The Section 10(b) claim alleges that during the class period the insured officers caused Raychem to issue at least 13 false or misleading statements regarding Raychem's fiscal year 1988 earnings and fiscal year 1989 prospects. The alleged misrepresentations fall into three groups: alleged false or misleading published statements in press releases, quarterly shareholder reports, and Raychem's 1988 Annual Report of financial results for Raychem's fiscal year 1988; alleged false or misleading statements in press releases, SEC filings, and by the insured officers at an August 1988 meeting of industry analysts regarding financing for, and expenses of, Raynet Corp. (Raychem's fiber optics subsidiary); and unjustifiably optimistic statements in Raychem's 1988 Annual Report regarding Raychem's fiscal year 1989 prospects.

---

1. Insured persons are defined as directors or officers of the insured corporation. Certain other executives are also classified as insured persons: assistant secretary, assistant treasurer, controller, corporate insurance manager, corporate patent counsel, counsel, director of corporate product review, director of internal audit, director of the tax department, division general manager, and country manager.

2. As used in this order, "Section 10(b)" refers collectively to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

The shareholders alleged that Raychem's management made these misrepresentations in order to permit conversion of their shares under Raychem's Series B stock program. Raychem issued options to purchase Series B stock to key employees in 1983. Holders of Series B stock could convert their Series B shares into Raychem common stock within five years if the company's performance reached certain target levels. The *Cytryn* complaint alleges that "Raychem's management had a strong incentive to maximize Raychem's reported income in its 1988 fiscal year in order to permit conversion of their [Series B] shares in 1988, to increase the number of shares received on conversion, and to inflate the market price of Raychem stock to increase the amounts they would receive when they sold their stock following conversion." (Complaint ¶ 21.) The complaint further alleges:

> [T]he individual defendants and other Raychem managerial employees embarked upon a scheme to artificially inflate Raychem's reported income for its 1988 fiscal year by various manipulative devices including the postponement of and failure to record expenditures, improper capitalization of costs that would otherwise be recorded as expense, the shipping of merchandise as much as six months before the scheduled shipping date and improperly recording revenues from such shipments, and the structuring of the receipt of revenues of Raynet so that Raynet expenses would be offset in fiscal 1988 rather than in subsequent years, and would contribute to Raychem's reported income in its 1988 fiscal year.

Complaint at ¶ 4.

The named defendants included individuals who, during the class period, served as Raychem's CEO, President and Chief Operating Officer, Senior Vice President and CFO, Treasurer, Vice President for Finance, and Senior Vice President for Telecommunications Sector (as well as Raynet's President). All of these persons have submitted declarations averring that they either made, supervised the preparation of, or approved the alleged misleading statements. The remaining named defendants managed corporate divisions within Raychem and supervised the preparation of divisional forecast and strategic plans as part of Raychem's strategic planning process each year. According to the declaration of Francis Lunger, the accounting firm Price Waterhouse audited Raychem's fiscal year 1988 financial results. (Lunger Decl. ¶ 3.) Price Waterhouse, however, was not named in the *Cytryn* complaint.

Raychem, on behalf of itself and the individual defendants, gave notice of the claims in the *Cytryn* complaint to Federal on January 31, 1989. Raychem retained Heller, Ehrman as defense counsel on behalf of Raychem and the individual defendants. Several of the individual defendants with potentially divergent interests also retained "shadow counsel" to monitor the litigation on their behalf. Defense counsel provided Federal with all the pleadings filed in the *Cytryn* action, with an analysis of liability prepared by defense counsel, and with the damages analysis of an expert consultant retained by defense counsel. Defense counsel also briefed Federal on several occasions on the status of defense counsel's factual investigation of the *Cytryn* claims. Federal interviewed all but two of the individual defendants.

Following pretrial discovery, the *Cytryn* parties participated in numerous settlement conferences presided over by Magistrate Judge Infante, all of which Federal attended pursuant to order of the court. On December 12, 1991, a settlement agreement was reached between the parties, under which defendants were obligated to pay plaintiffs $19.5 million. Federal's representatives participated in the settlement conferences and acknowledged the terms of the settlement reached on the record at the final settlement conference. Raychem and Federal funded the settlement provisionally on December 23, 1991. Federal paid $11.25 million into the settlement fund and Raychem paid $8.25 million. An April 22, 1992 resolution of Raychem's Board of Directors authorized Raychem to indemnify the individual defendants for all settlement obligations ($8.25 million) and defense costs ($1,646,887) incurred in the *Cytryn* action.

In this action, Raychem requests a judgment in the amount of $8,896,887, representing $8.25 million in unreimbursed settlement costs plus $1,646,887 in defense costs, minus the Policy's $1 million deductible under Insuring Clause 2.

## DISCUSSION

### A. The Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides for summary judgment where no genuine issue exists as to any material fact and where the moving party is entitled to judgment as a matter of law. Under 56(c), the burden falls on the moving party to establish that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party may meet this burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial. Once it has done so, the burden shifts to the non-moving party to present specific facts showing that contradiction is possible. *British Airways Board v. Boeing Co.*, 585 F.2d 946, 950–952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

A party opposing summary judgment may not rest upon the mere allegations or denials contained in the pleadings. S/he must set forth, by affidavits or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial. A mere "scintilla" of evidence will not suffice; the non-moving party must show that the fact-finder could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable ... or is not significantly probative, summary judgment may be granted." *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir.1987) (citing *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2512). In making this determination, the court must take the non-moving party's evidence as true and all inferences are to be drawn in the light most favorable to the non-moving party. *Eisenberg*, 815 F.2d at 1289.

### B. Burdens of Proof

■ Although the insured has the burden of proving the contract of insurance and its terms, as well as the loss, the insurer bears the burden at trial of proving that a statutory or policy exclusion or limitation applies. *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 879–80, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978); *Executive Aviation, Inc. v. National Ins. Underwriters*, 16 Cal.App.3d 799, 806, 94 Cal.Rptr. 347 (1971).

Insuring Clause 2 limits coverage to indemnification "as permitted or required by law." Defendant argues that the law does not permit Raychem to indemnify its directors and officers. The parties agree that the burden of proving that indemnification is permitted by law rests with plaintiffs.

Insuring Clause 2 also limits coverage to "losses", which under the policy's definition of loss does not include matters "uninsurable under the law". Federal argues that Raychem may not obtain insurance for reckless, willful, or criminal conduct. Federal nonetheless contends that Raychem bears the burden of proof on this issue because the phrase is located in the definition of "loss." In *Clemmer v. Hartford Insurance Co.*, 22 Cal.3d 865, 879–880, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978) the court pointed out that the provisions of California Insurance Code section 533 (insurer is not responsible for a loss caused by the willful act of the insured) have been held to be the equivalent of an exclusionary clause and that the burden of showing that the loss is uninsurable is on the insurer. Therefore, Federal bears the burden of proving that the requested claims are matters "uninsurable under the law."

■ Furthermore, Insuring Clause 2 limits coverage to "wrongful acts" committed by any insured person. Federal argues that uninsured parties committed some of the wrongful acts and that the settlement liability should be allocated between insured and uninsured parties. Relying on differences in state law, some courts have placed the burden of proving allocation on the insurer,

while others have placed it on the insured.[3] California has not directly addressed the issue. However, the better reasoned cases support the conclusion that the initial burden should be on the insured. The party seeking coverage must show the existence and extent of a loss covered by the policy. Further, the insured has better access to information relevant to allocation than does its insurer, particularly, as here, where the insured chose counsel for itself and its officers and controlled the defense. Therefore, the court concludes that Raychem has the burden of making a *prima facie* showing that the settlement and defense costs incurred in *Cytryn* related to the settlement of covered claims against the insured individuals. Since as discussed below, Raychem has made that showing, Federal has the burden to raise a genuine issue of material fact with respect to this point to defeat summary judgment.

Raychem cites *Hogan v. Midland Nat'l Ins. Co.,* 3 Cal.3d 553, 564, 91 Cal.Rptr. 153, 159, 476 P.2d 825, 831 (1970) and *California Union Ins. Co. v. Aquarius,* 113 Cal.App.3d 243, 248, 169 Cal.Rptr. 685, 687 (1980) and argues that the burden is on Federal to prove that Raychem should be allocated some responsibility for payment of the indemnity and defense costs. However, both cases construed policies containing a broad defense obligation which is not contained in a D & O policy, and thus offer little assistance here.

Finally, defendant argues that under the policy's definition of "wrongful act", the act must occur in the insured's "insured capacity." Plaintiffs bear the burden of proving that the actions occurred in the insureds' "insured capacities," as this argument involves proving that their actions occurred within the definitional terms of the policy's coverage.

## C. Was Raychem's indemnification of its Directors and Officers "permitted by law"?

Insuring Clause 2 limits indemnification "as permitted or required by law." Federal argues that Raychem's indemnification of its directors and officers was not permitted by federal or state law.

### 1. Federal Law

■ The SEC has long taken the position that corporations cannot indemnify their directors against liability for violating certain provisions of the 1933 Act. J. Olson & J. Hatch, *Director and Officer Liability: Indemnification and Insurance* § 6.05[1] (1991). Federal courts have held that those *held liable* for violations of certain provisions of the federal securities laws, including the anti-fraud provisions of the 1934 Act, may not recover indemnification. *See Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1288 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) (underwriter could not recover from issuer under indemnification agreement where jury had found underwriter guilty of misconduct involving "actual knowledge", in violation of § 10(b)). Similarly, courts have dismissed claims for indemnification for alleged violations of federal securities laws. *See Stewart v. American Int'l Oil & Gas Co.,* 845 F.2d 196, 200 (9th Cir.1988) (seller could not recover on third-party claims for indemnifica-

---

3. Some courts have held that the burden is on the *insurer* to demonstrate to what extent a settlement of a lawsuit against directors, the corporation and a third party must be allocated to the corporation and third party. *See, e.g., PepsiCo, Inc. v. Continental Casualty Co.,* 640 F.Supp. 656, 662 (S.D.N.Y.1986) (evidence of good faith settlement of underlying litigation creates presumption that costs are covered by the policy and the insurer then bears the burden of proving exclusion); *Health–Chem Corp. v. National Union Fire Ins. Co.,* 148 Misc.2d 187, 559 N.Y.S.2d 435, 438 (1990) (once policyholder shows that an expense was incurred in defense of a covered party, insurer had burden of showing what portion should be excluded as incurred in defense of a

non-covered party). *But see John Hancock Healthplan v. Lexington Ins. Co.,* 1990 WL 21137, 1990 U.S.Dist. LEXIS 2450 (E.D.Pa. March 6, 1990) (Since the insured was in possession of more relevant facts and documents relating to liability than the insurer, the burden of proof rested on the corporation to prove an appropriate allocation); *Continental Cas. Co. v. Bd. of Educ. of Charles County,* 302 Md. 516, 489 A.2d 536, 546 (1985) (the insureds bore the burden of establishing that a given item of legal service or expense was reasonably related to defense of covered counts); *Nodaway Valley Bank v. Continental Cas. Co.,* 715 F.Supp. 1458, 1467 (W.D.Mo.1989) (same).

tion, in the event of an adverse judgment, against companies from which seller had acquired interests); *Laventhol, Krekstein, Horwath & Horwath v. Horwitch,* 637 F.2d 672 (9th Cir.1980) ("permitting [cross claim for] indemnity would undermine the statutory purpose of assuring diligent performance of duty and deterring negligence"); *Odette v. Shearson, Hammill & Co., Inc.,* 394 F.Supp. 946, 954–57 (S.D.N.Y.1975) (investment bank could not maintain third-party complaint for indemnification against commercial bank where liability under § 10(b) presupposed a finding of knowing misrepresentation or reckless disregard for the truth). Courts have reasoned that "it would be against public policy embodied in the federal securities legislation to permit [the violator] to enforce its indemnification agreement," *Globus,* 418 F.2d at 1288, for indemnification would reduce the deterrent effect of the securities laws. *Odette,* 394 F.Supp. at 954. *See also* J. Olson & J. Hatch at § 6.05[3].

More recently, at least one circuit has found that there is no right to indemnification under the federal securities laws because indemnification is not explicitly allowed under the Securities and Exchange Act of 1934 and cannot be implied under the Act. *See King v. Gibbs,* 876 F.2d 1275 (7th Cir.1989). In *King,* defendants in a § 10(b) claim *settled* with plaintiffs. Although plaintiffs named both a corporation and its officers and directors, the corporation funded the entire settlement. The corporation's counsel represented both the corporation and the individual defendants, but one of the officers, a Mr. Gibbs, also retained independent counsel. Gibbs cross-complained against the other defendants for indemnification for the money he expended for independent counsel in defending the underlying action. The court rejected his argument, holding that the SEC Act of 1934 did not expressly or impliedly create an indemnification right.

This federal precedent, however, is distinguishable. In *Globus,* defendants were found to have violated the securities laws. Here, by contrast, defendants did not admit liability in settling the underlying suit. Thus, the policies behind the *Globus* rule do not apply here with equal force. *Stewart,*

*Laventhol,* and *Odette* dismissed *claims* for indemnification for alleged violations of securities laws, and *King* merely held that there was no *right* to indemnity under the securities laws. Neither of these two lines of cases dealt with the question whether a corporation may voluntarily indemnify its officers and directors for settlement payments and defense costs.

In fact, courts have allowed indemnification where parties are seeking indemnification for *settlement* payments and defense costs. In *The Cambridge Fund, Inc. v. Abella,* 501 F.Supp. 598, 618–19 (S.D.N.Y.1980), the court considered and rejected an argument that public policy barred indemnification for amounts paid under a consent decree. "Read most liberally, [*Globus* ] stands for the proposition that it is against public policy to allow a party who has been adjudicated to have been engaged in reckless, willful or criminal conduct to shift his liability to others.... [H]ere, unlike the situation in [Globus], there has been no adjudication of willfulness—only the entry of a consent order with such findings." *Id.* Moreover, in *PepsiCo, Inc. v. Continental Cas. Co.,* 640 F.Supp. 656 (S.D.N.Y.1986), the court considered a policy containing an identical definition of loss, i.e. an amount which the corporation may be "required or permitted by law" to pay as indemnity. The court rejected an insurer's argument that public policy barred indemnification by the corporation of directors' and officers' settlement and defense costs in a 10b–5 case.

Furthermore, allowing a corporation to indemnify its officers and directors for settlement payments and defense costs supports two competing public policies: encouraging qualified individuals to serve as corporate officers and directors, and encouraging settlement of class action lawsuits. Thus, federal law does not prohibit Raychem's indemnification of its officers and directors for settlement payments and defense costs.

*2. State law*

■ Indemnification, like other internal corporate affairs, is governed by the law of the state of incorporation. *See, e.g., Gross v. Texas Plastics, Inc.,* 344 F.Supp. 564 (D.N.J.

1972), aff'd, 523 F.2d 1050 (3d Cir.1975). Raychem is a Delaware corporation. Under Delaware law, a corporation may indemnify a director or officer for settlement payments and defense costs if 1) the suit was brought against the officer or director "by reason of the fact that he [or she] is or was" an officer or director, 2) the officer or director acted "in good faith", 3) he or she acted in "a manner he [or she] reasonably believed to be in or not opposed to the best interests of the corporation", and 4) the expenses incurred in the suit were "reasonable." Del.Code Ann. tit. 8, § 145(a). The settlement itself does not create a presumption that the person did not meet the standard of conduct. Instead, a majority vote of a quorum of directors who were not parties to the suit, among others, may make the determination of good faith. Del.Code Ann. tit. 8, § 145(d).

Raychem has presented evidence showing that its indemnification complied with Delaware law. During a separate meeting after the regular session of the April 22, 1992 Board of Directors meeting had adjourned, members of Raychem's board who were not named in the lawsuit passed a resolution to indemnify the named officers and directors. (See Vizas Decl., Exh. 1.) The board based its decision upon a finding as to each of the individual defendants that: 1) the suit was brought against him by reason of the fact that he is or was an officer or director, 2) he acted in good faith, 3) he acted in a manner reasonably believed to be in or not opposed to the best interests of the corporation, and 4) the defense and settlement costs incurred in the lawsuit were reasonable. (Vizas Suppl. Decl. ¶¶ 2 & 3.) This evidence is sufficient to meet Raychem's burden, shifting the burden to Federal to present evidence to oppose these declarations. Federal has put forth no such evidence. Thus, it appears at this time that Raychem's indemnification of its officers and directors complied with Delaware law.

Section 145(f) of the same Delaware statute also supports the conclusion that Raychem acted in accordance with Delaware law. Under section 145(f) the corporation can grant indemnification rights beyond those provided by section 145(a). The corporation can grant such further indemnification rights under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. Del.Code Ann. tit. 8, § 145(f); Hibbert v. Hollywood Park, Inc., 457 A.2d 339, 344 (Del.1983). In PepsiCo, the insurance policy contained an identical provision to the provision at issue here, which allowed reimbursement for indemnification as "required or permitted by law." Although PepsiCo had not complied with the procedural requirements of section 145(d), the court rejected the insurer's argument that PepsiCo's indemnification was not permitted by law. PepsiCo had passed a board resolution allowing it to indemnify any director or officer for settlement payments and defense costs. 640 F.Supp. at 660–61. The court held that the board resolution indemnifying the officers and directors was independently permissible under section 145(f):

> The simple vote of the Board of Directors, according to the corporation's By-Laws, was a procedurally correct method of indemnifying the directors. Accordingly, no further discovery pursuant to Fed.R.Civ.P. 56(f) on this issue is necessary.

640 F.Supp. at 660–61. Here, the April 22 resolution accords with the certificate of incorporation of Raychem, art. 9, ¶ B(1). (McLean Decl., Exh. A.) Thus, the April 22, 1992 resolution of Raychem's disinterested directors appears lawful under section 145(f).

### 3. *Preemption*

Federal argues that the federal precedent exemplified in the *Globus* case preempts the Delaware law.

█ Federal law may preempt state law in one of three ways: 1) where federal law expressly preempts state law, 2) where federal law impliedly preempts state law by "occupying the field," or 3) where state law conflicts with federal law. See L. Tribe, *American Constitutional Law* § 6–26 n. 14 (2d ed. 1988). Congress has not expressly or impliedly preempted state corporation laws such as Delaware Corporation Law section 145. See *Santa Fe Industries v. Green*, 430 U.S. 462, 478–79, 97 S.Ct. 1292, 1303–04, 51 L.Ed.2d 480 (1977). Thus, defendant's argument must rest on conflict preemption.

■ Because we concluded above that federal law does not bar corporate indemnification of officers and directors for settlement payments and defense costs in securities cases, there is also no conflict preemption. In *PepsiCo,* 640 F.Supp. 656, the court relied on Delaware case law interpreting a Delaware statute governing when, and under what conditions, a corporation may indemnify its directors and officers. Thus, the court applied state law to the issue of indemnification of settlement expenses, despite the *Globus* rule. *See also* David W. Ichel & Sharon D. Thompson, *Directors' and Officers' Insurance Coverage: An Overview Current Issues,* in 1 *Securities Litigation 1987: Prosecution and and Defense Strategies* 259, 286 (Practising Law Institute, 1987) (interpreting the standard clause "required or permitted to indemnify under law" to mean that in instances where state law prohibits indemnification by the corporation, there will be no coverage under the policy).

Plaintiffs have met their burden of producing evidence to show that indemnification was "permitted or required" by law. Defendants have not met their burden of producing evidence to contradict that showing. Thus, plaintiffs are entitled to summary judgment in their favor on this issue unless Federal can show that Raychem's indemnification resolution was not made in good faith. Did the directors make the findings which justified indemnification in good faith and on the basis they claim they did or did they merely seize an opportunity to try and pass on a loss to their carrier?

**D.** *Are the settlement and defense costs "matters uninsurable under the law"?*

Insuring Clause 2 also defines loss to exclude matters "uninsurable under the law." Federal claims that it has no obligation to reimburse Raychem where it would be contrary to public policy.

The *Globus* line of cases involved indemnification, not insurability. Under both Delaware and California law, a corporation may purchase insurance

on behalf of any agent of the corporation against any liability asserted against or incurred by the agent in that capacity or arising out of the agent's status as such whether or not the corporation would have the power to indemnify the agent against that liability under this section.

Cal.Corp.Code § 317(i); *see* Del.Code Ann. tit. 8, § 145(a) (almost identical language). Thus, *Globus* and its progeny do not control the question whether Raychem may obtain reimbursement under its insurance policy for settlement and defense costs of the *Cytryn* action.

■ In order to ascertain whether settlement payments and defense costs for suits under Section 10(b) are insurable under the law, we must first determine the requisite scienter under that section of the securities laws. Section 10(b) and Rule 10b–5, stated generally, prohibit fraud in connection with purchase or sale of securities. Scienter is a necessary element in an action for damages under § 10(b). *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *Hochfelder* reserved the question whether reckless behavior will satisfy the scienter requirement, but the Ninth Circuit, along with ten other circuits, has held that recklessness may satisfy the element of scienter in a civil action for damages under § 10(b) and Rule 10b–5. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). *Hollinger* defined reckless conduct as

a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

914 F.2d at 1569. In so doing, *Hollinger* clearly separated recklessness from negligence. 914 F.2d at 1570. Other courts have held that gross or inexcusable negligence will not satisfy the scienter requirement. *See, e.g., Gilmore v. Berg,* 761 F.Supp. 358 (D.N.J.1991).

■ Under California Insurance Code section 533, "[a]n insurer is not liable for a loss

caused by the *willful* act of the insured; but he is not exonerated by the *negligence* of the insured, or of the insured's agents or others" (emphasis added). Willful, for purposes of section 533, has a unique meaning: even an act which is "intentional" or "willful" within the meaning of traditional tort principles generally will not exonerate the insurer from liability under section 533, unless it is done with a "preconceived design to inflict injury." *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865, 887, 151 Cal.Rptr. 285, 297, 587 P.2d 1098, 1110 (1978). Section 533 does not preclude coverage for acts that are *negligent* or *reckless. J.C. Penney Casualty Ins. Co. v. M.K., S.K.,* 52 Cal.3d 1009, 1020, 278 Cal.Rptr. 64, 70, 804 P.2d 689, 695 (1991).

Thus, Section 533 would not *per se* bar insurance coverage for alleged violations of § 10(b) and Rule 10b–5, which require only a showing of recklessness to fulfill the scienter requirement. If Federal could show that the individual officers and directors made knowing misrepresentations, they might be able to prove that the actions were willful, and hence, invoke the prohibitions of Section 533. Federal, who bears the burden of proof on this issue, has presented no evidence raising a genuine issue of material fact with respect to a possible higher level of scienter. Thus, summary judgment is appropriate, unless Federal can put forth facts which show that the acts of the officers and directors were willful.[4]

### E. Were the actions taken by "insured persons", and are defendants entitled to an allocation?

Federal next contends that allocation of settlement payments and defense costs is necessary because the Policy does not cover conduct committed by the corporation or by other uninsured parties, namely other employees of Raychem or outside accountants.

### 1. The law governing allocation

The Ninth Circuit has held that an insurer providing directors' and officers' liability insurance ("D & O insurance") may allocate defense costs between covered and uncovered *claims* in the underlying litigation. *See Gon v. First State Ins. Co.,* 871 F.2d 863, 868–69 (9th Cir.1989) (requiring insurer to pay all legal expenses as they were incurred, subject to apportionment and reimbursement for defense of uncovered claims after settlement or judgment in the underlying action); *Okada v. MGIC Indem. Corp.,* 823 F.2d 276, 282 (9th Cir.1986) (requiring insurer to advance defense costs for all covered and potentially covered claims, but allowing insurer to reserve rights with respect to those claims which might fall within the policy's exclusions).

The Ninth Circuit has not, however, addressed the situation in the instant case: allocation of settlement payments and defense costs between directors and officers and the corporation itself or other uninsured parties when they are joined as defendants in litigation under one covered claim.

Other circuits addressing the issue of settlement payments have largely adopted "relative exposure" approaches to allocation: allocating according to the relative risk of exposure of the various parties involved. The best reasoned of those cases, however, hold that allocation is appropriate only if, and only to the extent that, the defense or settlement costs of the litigation were, by virtue of the wrongful acts of uninsured parties, higher than they would have been had only the insured parties been defended or settled. This has been referred to as the "larger settlement rule."

For example, in *Nodaway Valley Bank v. Continental Cas. Co.,* 916 F.2d 1362, 1367

---

4. Due to the subjective nature of scienter, courts have been reluctant to grant summary judgment in § 10b–5 cases where scienter is a contested issue. *See Vucinich v. Paine, Webber, Jackson & Curtis,* 739 F.2d 1434, 1436 (9th Cir.1984); T. Hazen, *The Law of Securities Regulation* § 13.4, at 85, n. 23 (2d ed. 1990). In these cases, however, courts were called upon to determine the level of scienter on a summary judgment motion for purposes of § 10(b) liability. Here, by contrast, the parties settled the case before a court determined what level of scienter existed. The court finds now that the directors and officers could have been held liable for violating § 10(b) if they exhibited recklessness. In the absence of a showing from Federal, in response to Raychem's evidence, that raises a genuine issue of material fact as to the directors' and officers' higher level of scienter, summary judgment is proper.

(8th Cir.1990), the court upheld a district court's allocation of the liability exposure in a suit, which had settled, against the insured officers and directors, other uninsured employees, and an uninsured corporate holding company. The lower court had reasoned that the directors and officers bore the greatest risk of exposure, and so it allocated 90% of the liability for the settlement payments to the directors and officers, and 10% to the uninsured defendants.

The *Nodaway* case is distinguishable from Raychem's situation, however, because the plaintiff in the underlying case in *Nodaway* actually made claims against the uninsured employees. In Raychem's case, uninsured employees were not named as defendants.

Moreover, the district court in *Nodaway* rejected the insurer's argument that it was liable for the conduct of insured directors and officers but not for the corporate liability created by their acts. The court reasoned that where the uninsured corporate employer is joined in litigation with insured officers and directors, the D & O insurance should provide full coverage. *Nodaway Valley Bank v. Continental Cas. Co.*, 715 F.Supp. 1458, 1466 (W.D.Mo.1989). The court stated that the insurer's argument:

> comes dangerously close to saying that D & O insurance is *never* adequate insurance, making whole the insureds, when the uninsured corporate employer is joined in litigation with insured officers and directors. This would defeat the reasonable expectations of insureds who have purchased insurance that supposedly gives full coverage for director and officer liability. It seems clear that merely derivative corporate liability should not cause an apportionment between the primary wrongdoer and a vicarious wrongdoer, where both are joined in litigation. My conclusion would not expand the insurance policy to unfairly create corporate coverage; it simply gives full effect to the D & O coverage. Defendant would of course not be exposed to responsibility for corporate coverage where an uninsured employee creates corporate liability or even, apparently, where the corporation alone is sued.

715 F.Supp. at 1466. The court also noted that it was not required to resolve all fact and legal issues in the underlying case, but simply to determine what reasonable allocations should have been made, considering uncertainties in both fact and law known at the time of the settlement. 715 F.Supp. at 1465.

 The Seventh Circuit has also adopted the "larger settlement rule." *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 368 (7th Cir.1990). The underlying securities fraud suits were one class action against directors, officers and employees of the corporate employer identified only as "John Does," and a second suit which named the corporate employer and five of its directors, identified by their proper names. The corporation settled the two suits and then sued the insurer for reimbursement.

With respect to allocation between the corporation and its insured directors and officers, the Seventh Circuit found that the district court should allocate all liability for settlement payments to the directors and officers: "To allow the insurance companies an allocation between the directors' liability and the corporation's derivative liability for the directors' acts would rob [the corporation] of the insurance protection that it sought and bought." 922 F.2d at 368. To the extent that the amount for which Continental settled was *larger* than it would have been but for the misfeasance of uninsured persons or persons against whom no claim was made, however, the court found that the corporation's reimbursement should be reduced. The court remanded to the district court for a determination of how much larger the settlement was by virtue of the activities of uninsured individuals. 922 F.2d at 368.

In an earlier case, however, one district court, using the relative exposure rule, required the parties to allocate the settlement costs between those amounts attributable to the insured directors and officers and those attributable to the corporation and its accountants. *See PepsiCo, Inc. v. Continental Cas. Co.*, 640 F.Supp. 656 (S.D.N.Y.1986). Rule 10b–5 suits were filed against the corporation, the corporation's directors and officers, a former corporate officer, and the cor-

poration's accounting firm. The corporation and its directors and officers settled the case, with the insurer retaining its right to object to the reasonableness of the settlement. The insurer then objected to the settlement as unreasonable because it reflected the liability of the corporation and the accounting firm. The court agreed, reasoning that the corporation and the accounting firm benefitted from the settlement. 640 F.Supp. at 662. The court noted, however, that evidence of a good faith settlement of the underlying litigation creates a presumption that the costs are covered by the policy. *Id.*

In evaluating whether *defense costs* should be allocated between the corporation and the insured directors and officers, courts have adopted the "reasonably related" test. As stated by one court:

> [W]e do not believe that [insurer] is entitled to an apportionment between tort and contract counts based simply on the fact that an item of legal service or expense would be of use to counsel in defending a claim asserted under a contract count . . . in addition to its use in defending a tort count. Having purchased this form of . . . insurance, the [insured] is entitled to the full benefit of its bargain. So long as an item of service or expense is reasonably related to the defense of a covered claim, it may be apportioned wholly to the covered claim.

*Continental Cas. Co. v. Bd. of Education of Charles County,* 302 Md. 516, 489 A.2d 536, 545 (1985). *See also Harristown Develop-ment Corp. v. International Ins. Co.,* 1988 WL 123149 (M.D.Pa.1988) (following the *Charles County* case and concluding that "costs and expenses for items that were of use in defense of [an insured director] are recoverable from [the insurer] even though they may also have been useful in defense of [an uninsured corporation].") Other courts have adopted variations of the "reasonably related" test.[5]

### 2. Federal is not entitled to allocation

This court adopts, as most appropriate to this case, the rule in *Harbor,* 922 F.2d at 368, concerning settlement payments and the rule in *Charles County,* 489 A.2d at 545, concerning defense costs.

Under Insuring Clause 2 of the Policy, Federal is obligated to:

> pay on behalf of the insured organization *all loss* which the insured person has become *legally obligated to pay* . . . . (emphasis added).

The settling directors and officers are "legally obligated to pay" the entire amount of the settlement. Therefore, if Raychem's liability is merely derivative corporate liability based upon the conduct of the insured persons, Federal must pay the full amount of the settlement to fulfill its coverage obligation.

This conclusion does not mean, however, that the carrier is without recourse against any uninsured person who participated in the wrongful conduct but whose action did not increase the defense or settlement costs of

---

5. Another court considering allocation of defense costs looked to whether the claims were directed principally against the corporation or were focused on officer/director wrongdoing. In *Perini Corp. v. National Union Fire Ins. Co.,* 1988 WL 192453, 1988 U.S. Dist. LEXIS 17442 (June 2, 1988), the issue was defense costs incurred in defending both an officer and the corporation on a tortious interference claim based solely on the officer's conduct in writing a letter. The court held that a "major portion of the legal fees" incurred by counsel defending both the officer and the corporation were to be allocated to the defense of the officer (and therefore the insurer) because the liability of both the officer and the corporation stemmed solely from the act of the officer in writing the allegedly interfering letter. The court denied summary judgment, however, holding that a determination of the precise allocation of the fees must await further proceeding.

One state court, moreover, permitted allocation if it were "factually possible." In *Health–Chem Corp. v. National Union Fire Ins. Co.,* 148 Misc.2d 187, 559 N.Y.S.2d 435 (1990), the court allocated the expenses incurred by the corporation in defending two stockholders' class action suits for violations of federal securities laws, tried together. The court held the insurer responsible only for the expenses of defending the insured individuals, and not for the expenses of defending the corporation. In *Health–Chem,* some of the expenses were clearly separate, because in one case plaintiff sued Health–Chem alone, while in another case plaintiff sued Health–Chem along with insured individuals. The court also found that the expenses of defending the corporation in the suit in which it was a joint defendant could be allocated, and it denied summary judgment on this basis.

the litigation. If Federal has grounds for asserting that unnamed parties contributed to the conduct causing the loss, it is entitled to satisfy its obligation to its insureds, and then pursue its subrogation rights. Section 2.28 of the Policy, *see Employers Ins. of Wausau v. Musick, Peeler & Garrett,* 954 F.2d 575, 577–80 (9th Cir.1992).

Federal's contention that *Slottow v. American Cas. Co.,* 1 F.3d 912 (9th Cir.1993) amended 10 F.3d 1355 (9th Cir.1993) precludes the adoption of the *Harbor* standard is not persuasive. *Slottow* does not discuss the rules governing allocation for coverage purposes. The case did no more than overturn the trial judge's factual finding that the defendants' self allocation among themselves, as adjusted by him, was a good faith settlement under California law.

Raychem has met its burden of producing evidence to show that the settlement payments and defense costs were incurred in defending the officers and directors. Thus, concerning the allocation of settlement payments, Federal was required to adduce evidence to raise a genuine issue of material fact that Raychem was exposed to liability in the underlying suit due to actions other than those taken by Raychem's officers and directors. In support of its allegations that uninsured persons' actions increased the settlement amount, Federal presents only the allegations in the *Cytryn* complaint, which alleged that the individual defendants *and other Raychem employees* participated in the scheme to artificially inflate Raychem's reported income. Even if Federal could show that these employees participated in the scheme, no evidence has been offered suggesting that they increased the settlement amount. The corporation's potential liability stemmed entirely from the alleged misleading statements issued by the corporation through the named defendants, not from any other independent actions of uninsured parties in which the defendants were not involved. (Complaint ¶ 65; Sims Decl. ¶ 2; Lunger Decl. ¶¶ 2–3; Halperin Decl. ¶ 3; Saldich Decl. ¶ 3; Everett Decl. ¶ 4; Cook Decl. ¶¶ 2–6.) The named defendants, as stated in their declarations, supervised and approved the alleged misleading statements, even if other employees also worked on them.

Furthermore, Federal argues that allocation should take into account the actions of Raychem's accounting firm, which was not insured by Federal. The accounting firm, however, was not only not a defendant in the *Cytryn* action, but it was also not mentioned anywhere in the complaint. Allocation is to be based on the claims that were actually settled, not on claims that could have been brought or that the class plaintiffs might have chosen to pursue, but did not. To include the accountants in an allocation would be tantamount to reopening the case to consider claims which did not play a part in the settlement.

Concerning the allocation of defense costs, Federal must present evidence to raise a genuine issue of material fact that defense costs were incurred independent of any reasonable relation to the defense of claims against the officers and directors. *Charles County,* 489 A.2d at 545. Raychem has presented evidence, in the Poggi Declaration, listing legal fees of defense counsel and shadow counsel incurred in discovery, motions practice, analysis of claims, and settlement negotiations in the underlying suits.[6] Federal has failed to adduce any evidence indicating that these costs are not reasonably related to the defense of claims against the officers and directors.

Thus, because Federal has failed to raise a genuine issue of material fact, allocation in

---

6. Federal objects to statements in the Poggi Declaration in which Mr. Poggi, General Counsel and Secretary of Raynet, states that he has reviewed Defense Counsel and Shadow Counsel fees and finds them "reasonable" based on his experience. Federal relies on *Cermetek v. Butler Avpak, Inc.,* 573 F.2d 1370, 1376–77 (9th Cir. 1978). This case held that statements in an affidavit alleged on "understanding" on "information and belief" are not sufficient to create a genuine issue of material fact. In *Cermetek,* the affiant did not have personal knowledge of the matters asserted. The Poggi affidavits, by contrast, indicate that Poggi made his statements based on his review of the fees and on his experience. In any event, we need only decide whether Federal has raised a genuine issue of material fact that some of the defense costs were not "reasonably related" to claims against insured persons.

this case would be improper and plaintiffs are entitled to summary adjudication of this issue.

### F. Did the named insureds undertake actions in their capacity as Officers and Directors?

Finally, Federal argues that the policy's definition of wrongful act is limited to actions taken in the insured's "insured capacity." Federal argues that there are significant questions regarding whether defendants were acting in their capacities as officers and directors in performing the acts giving rise to the underlying complaint. Federal contends that the officers and directors were acting primarily in their best interests as shareholders and are therefore non-insured.

The cases cited by Federal are unpersuasive. *Olson v. Federal Ins. Co.,* 219 Cal. App.3d 252, 268 Cal.Rptr. 90 (1990), held that a D & O policy did not provide coverage for litigation among corporate shareholder-directors concerning business relations with another corporation also owned by the same shareholders, because the claims involved a dispute between the individuals as shareholders, not as directors. The court applied an objective standard in determining whether the record disclosed whether the conduct was within the meaning of the coverage clause. 268 Cal.Rptr. at 94. The insured brought the underlying suits for the sole purpose of protecting his interests as majority shareholder. *Beck v. American Casualty Co.,* 1990 U.S.Dist. LEXIS 13756 (W.D.Tex. Apr. 12, 1990), involved policy language restricting "wrongful acts" to misleading statements by the directors or officers in the discharge of their duties "*solely* in their capacity as Directors and Officers or any matter claimed against them *solely* by reason of them being Directors or Officers." *Id.* at 32 (emphasis added). Moreover, the underlying complaint in *Beck* involved misrepresentations in a written stock sale agreement specifically executed by the directors in their capacity as shareholders and the complaint against them specifically alleged that the misrepresentations were made "in their capacity as Inside Shareholders." *Id.* at 40–41. In *Berenson v. World Jai–Alai, Inc.,* 374 So.2d 35, 39 (Fla.

App.1979), Berenson was a director and officer of World Jai–Alai and a member of a joint venture that was negotiating to lease properties from World Jai–Alai. The coventurers sued Berenson for tortious interference with contract when he obtained the lease for his own benefit. In negotiating a lease between himself and World Jai–Alai, Berenson was not acting in the interest of the corporation. Therefore, he was not acting in the capacity of an officer or director.

Moreover, in *Nodaway,* the fact that the directors and officers were also shareholders who benefitted from the merger scheme to prevent the takeover did not lead the court to conclude that the actions were taken in their capacity as shareholders. The district court rejected the insurer's argument to this effect, holding that "where it is official conduct that is complained of" (here, formulating and adopting a merger plan to be approved by shareholders), the fact that directors are also stockholders is "immaterial." 715 F.Supp. at 1466.

Here, the Policy's definition of wrongful act is not limited to misleading statements made solely in the capacity as officers and directors. Thus, *Beck* is distinguishable. Federal cites the *Cytryn* complaint to support its argument that the named defendants made the alleged misrepresentations in their best interests as stockholders rather than in their capacity as directors and officers. The favorable Series B conversion to the individual named defendants and the subsequent sales of the converted stock by the individual named defendants resulted in substantial profits, alleged the complaint. Raychem responds that the misconduct that gave rise to liability—the publication of allegedly false and misleading reports—occurred in the defendants' capacities as officers and directors. Moreover, the complaint specifically alleges that they were acting as officers and directors in publishing the statements. Complaint, ¶ 14. As in *Nodaway,* the *Cytryn* plaintiffs complained of this "official conduct" of publishing the statements, not of the stock conversion by itself. The stock conversion merely provided a possible basis for defendants' alleged scienter. Moreover, the *Cytryn* complaint named officers who did not

own or sell stock as defendants. For example, officers Everett and Lunger did not own Series B shares and neither they nor officer Halperin sold any Raychem stock during the class period. Complaint, ¶¶ 13(b), (k), & (*l*).

Thus, Federal has raised no genuine issue of material fact indicating that defendants were not acting in their capacity as officers and directors.

### G. *Should the court allow Federal additional time in which to do discovery before ruling on the motion?*

Raychem objects to any consideration of Federal's request for discovery because Federal's Rule 56(f) affidavit was not timely filed and because Federal failed to seek Rule 56(f) relief by separate motion. However, Raychem made no objection at the time the affidavit was filed that it was untimely, nor did it complain about Federal's failure to make a separate motion to strike. Raychem clearly knew that Federal was asking for time to do discovery when the Rule 56(f) declaration was filed. The court is not persuaded that it should deny Federal the right to do discovery based upon its procedural deficiencies.

The more pertinent questions are whether Federal had ample opportunity to pursue discovery and investigation prior to this motion and whether the discovery Federal seeks is relevant.

Federal was advised by defense counsel in *Cytryn* of the status of that litigation and provided some investigatory information about the factual allegations. Federal was given all the pleadings and at its request was provided with an analysis of liability based upon the discovery and applicable legal principles. Federal received briefings from defense counsel and interviewed all but two of the insured officers and directors. Federal's representatives were present and participated in all the settlement conferences and acknowledged the terms of the settlement reached on the record at the final settlement conferences.

Raychem filed this action on December 16, 1991 and did not bring its summary judgment motion until August 6, 1992. In those seven plus months, Federal served no discovery. Even after Raychem told Federal of its intention to move for summary judgment, Federal did not act. Therefore, the court finds that Federal had ample time to do investigation and discovery prior to the motion with two narrow exceptions. The court also is influenced by the fact that despite the time that has passed and the investigation that has been done, Federal has no significant leads to information that would raise a triable issue of fact except the allegations in the *Cytryn* complaint itself.

 As discussed earlier in this opinion, the court has determined that indemnification of officers and directors for settlement payments and defense costs in securities cases is "permitted by law." However, Raychem's disinterested directors did not pass their resolution indemnifying the settling officers and directors until April 22, 1992. The court concludes that Federal should be given the opportunity to do discovery on the limited issue of the independent board members' good faith in passing the resolution. Although Federal could have conducted that discovery before the motion, the time was limited.

 The court has also concluded that the burden is on Federal to show that the loss is "uninsurable under the law." Federal, to date, has offered no evidence that the conduct of the officers and directors was willful as defined by California Insurance Code § 533. However, Federal has a point that while the *Cytryn* action was pending, it was not in a position to file a declaratory relief action and seek evidence of misconduct by the officers and directors which would have been relevant to coverage issues but could have prejudiced the insureds' defense as well. *See Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993). Further, Raychem's counsel certainly could not have been expected to supply information adverse to his clients' coverage position. Therefore, Federal's opportunity to investigate the "willfulness" issue has existed in the main only since Federal's appearance in this coverage proceeding. Therefore, the court finds that

Federal should be given additional time in which to do discovery on this issue.

The discovery Federal seeks on allocation is mostly, if not entirely, irrelevant. Further, Federal has had ample time to investigate and do discovery on this issue. It does not even have a lead which suggests it will find evidence to support its position. Therefore, no further discovery will be allowed on the allocation question.

Raychem's evidentiary submission shows that the class plaintiffs' claims were based exclusively on Raychem statement and public filings that were made and authored by the insured individual defendants. Accordingly, *even if* uninsured people were "involved," the principles of joint and several liability that control Section 10(b) liability would have left the insured "legally obligated to pay" the full amount. This legal obligation to pay invokes coverage under the policy. Langlois Decl. Ex. 1, ¶ 2.2.

None of the discovery requested in the Greenberg Declaration would produce a different result. Paragraphs 5(b), 5(c), 5(d), 5(e) and 5(f) all seek discovery to establish that uninsured persons were somehow involved with the insureds in the statements that the class plaintiffs challenged. For example, paragraph 5(e) seeks the deposition of Raychem's former controller to establish that lower level employees "provided or reviewed any financial information and press releases (sic)." But none of this discovery seeks to attack the insured's declarations that they were responsible for the challenged statements, or to demonstrate that the settlement amount was higher as a result of uninsured people's involvement. At most, the discovery would show that uninsured persons were jointly liable *with* the insured directors and officers for damages arising from the challenged statements. Under *Harbor*, that is insufficient to justify allocation.

None of the discovery Federal seeks appears directed toward the claim that the named insureds did not undertake actions in their capacities as officers and directors. In any event, the court does not believe that any relevant information beyond that already known could be discovered on that issue. Further, Federal has had ample time to do investigation and discovery on the issue of the capacity in which the insured acted.

### CONCLUSION

For the reasons stated above, this court finds as follows:

1) Indemnification of officers and directors for settlement payments and defense costs in a securities fraud action is "permitted by law."

2) Federal has raised no genuine issue of material fact indicating that Raychem's indemnification of its officers and directors was not in good faith, but Federal will be given six (6) months in which to do discovery on this issue.

3) Federal has raised no genuine issue of material fact indicating that the settlement payments and defense costs in this case were for "matters uninsurable under the law", but Federal will be given six (6) months in which to do discovery on this issue.

4) Federal has failed to raise a genuine issue of material fact indicating that 1) Raychem was exposed to increased liability in the underlying suit due to actions other than those taken by Raychem's officers and directors, or that 2) the defense costs were not reasonably related to the defense of claims against the officers and directors. Thus, allocation is improper.

5) Raychem has established *prima facie* that defendants were acting in their capacity as officers and directors. Federal has raised no genuine issue of material fact indicating otherwise. Summary adjudication is granted on this issue.

6) Raychem may re-notice its motion for partial summary judgment after six (6) months from the date of this order.